IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANIEL W. CLEARY,

     Plaintiff

v.

                    Civil Case No.: 1:17-cv-02252-JMC

FAGER'S ISLAND, LTD. *et al.*,

     Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

The case is before me for all proceedings by the consent of the parties pursuant to 28 U.S.C. § 636(c). (ECF Nos. 98 & 99). Now pending before the Court are eight pretrial motions. (ECF Nos. 57, 59, 60, 70, 74, 82, 83, 84). The parties have filed their respective oppositions and replies, as described in detail below. No hearing is needed. *See* Loc. R. 105.6 (D. Md. 2019). For the reasons described herein:

1. Plaintiff's Motion in Limine to Preclude any Evidence related to Plaintiff's Non-use of a Seat Belt (ECF No. 57) is **GRANTED**;

2. Defendants' Motion in Limine to Strike or Preclude Testimony of Stephen Eisenberg (ECF No. 59) is **DENIED in PART and GRANTED in PART**;

3. Defendants' Motion in Limine Preclude Evidence of Prior Incident or Lawsuits (ECF No. 60) is **GRANTED**;

4. Plaintiff's Motion to Preclude the testimony of Tara T. Amenson, Ph.D. (ECF No. 70) is **DENIED without PREJUDICE**;

5. Plaintiff's Motion in Limine to Preclude the Testimony of John S. Kashani, D.O. (ECF No. 74) is **DENIED in PART and GRANTED in PART**;

6. Defendants' Motion in Limine to Preclude the Testimony of Dr. Huffman (ECF No. 82) is **DENIED**;

7. Defendants' Motion in Limine to Preclude the Testimony of Dr. Caplan (ECF No. 83) is **DENIED**;

8. Defendants' Motion in Limine for Spoliation Sanctions (ECF No. 84) is **DENIED**.

## BACKGROUND

On August 16, 2014 Daniel Cleary ("Plaintiff") was a front seated passenger in a golf cart[1] owned and operated by a group of restaurant/bar and hotel entities ("Fager's Island" or "Fager's") in Ocean City, Maryland.  See (ECF No. 57-1 at 1).  On the day of the incident, a Fager's employee offered a golf cart ride to Plaintiff when he was near 60th street and Coastal Highway.  *Id.*  Fager's uses golf carts for the purpose of transporting patrons and/or business invitees from the public street and/or parking lots to their businesses.  *Id.* at 1 n.1.  According to Plaintiff, after picking him and his friends up, the Fager's employee "drove straight, with full acceleration, westbound on 60th Street, until making a sharp left turn (almost 90 degrees), at the end of 60th Street, into Fager['s] parking lot."  *Id.*  Plaintiff alleges that prior to turning left, the Fager's employee gave no warning, and did not slow down.  *Id.*  During the turn, Plaintiff was ejected from the golf cart.  *Id.*

---

[1] Throughout their respective briefings, the parties utilize the word "golf cart."  In the interest of clarity, the Court will also utilize this terminology.

PLAINTIFF'S MOTION TO PRECLUDE ANY EVIDENCE RELATED TO PLAINTIFF'S NON-USE OF A SEAT BELT

Plaintiff argues that Maryland law precludes the introduction of any evidence related to the non-use of seat belts in this case. (ECF No. 57-1). At the time of the incident, the Defendants allege that the subject golf cart had seat belts. *Id.* at 1. Defendants further contend that there was a warning taped to the front of the golf cart windshield cautioning that "all riders must wear seat belts." *Id.* at 2. Plaintiff disagrees and responds that this windshield warning first appeared during a site visit by counsel and experts in the summer of 2018. *Id.* at 2 n.2. In support thereof, Plaintiff provides deposition testimony from Fager's corporate representative, Mr. Meyers, wherein he said that a sign requiring riders to "keep hands and feet inside at all times," was posted on the golf carts in August of 2014, but he could not confirm that a seat belt instruction was present at the time of the incident. (ECF No. 57-1 at 23). Further, Plaintiff points to an exhibit included in one of Defendants' expert's reports that depicts a Google "street view" of the premises in question prior to the incident, including a golf cart that does not contain a seat belt instruction. (ECF No. 65 at 23–27). Finally, Plaintiff testified that he was unaware that there were seat belts in the golf cart. (ECF No. 57-1 at 11).

Defendants argue that Plaintiff was contributorily negligent for failing to wear a seat belt and for not abiding by the seat belt warning. (ECF No. 61 at 3) ("[E]vidence of Plaintiff's failure to use his seat belt is admissible to prove his contributory negligence . . . ."). Plaintiff articulates that Maryland Transportation Code Annotated § 22-412.3, relating to "Motor Vehicles," precludes the introduction of any evidence related to the non-use of seat belts. *Id.* In full, this statute states:

(h)(1) Failure of an individual to use a seat belt in violation of this section may not:
    (i) Be considered evidence of negligence;
    (ii) Be considered evidence of contributory negligence;
    (iii) Limit liability of a party or an insurer; or
    (iv) Diminish recovery for damages arising out of the ownership, maintenance, or operation of a motor vehicle.

(2) Subject to the provisions of paragraph (3) of this subsection, a party, witness, or counsel may not make reference to a seat belt during a trial of a civil action that involves property damage, personal injury, or death if the damage, injury, or death is not related to the design, manufacture, installation, supplying, or repair of a seat belt.

Md. Code Ann., Transp. § 22-412.3(h).

Defendants argue that a golf cart does not meet the definition of "motor vehicle" under the statute such that its preclusion of seat belt evidence does not apply. (ECF No. 61 at 3). This Court agrees that the golf cart in question does not meet the definition of a "motor vehicle" for purposes of the above statute for the reasons articulated by Defendants. *Id.* at 3–5. Thus, the statutory prohibition on seat belt evidence does not apply. That, however, does not end the inquiry.

Even in the absence of the statute, Maryland common law disfavored the introduction of seat belt evidence as evidence of contributory negligence or in support of an argument that the failure to wear a seat belt contributed to or exacerbated the injuries. See *Cierpisz v. Singleton*, 247 Md. 215, 227 (1967), *Ramrattan v. Burger King Corp.*, 656 F. Supp. 522, 527 (D. Md. 1987) ("Maryland common law provided that failure to use a seat belt was not evidence sufficient to support a finding of contributory negligence."). Defendants attempt to use *Cierpisz* in support of their argument, notwithstanding its holding, based on the following language from the opinion:

> We hold, also, that the failure to use the seat belt, standing alone, is not evidence sufficient to support a finding of contributory negligence. *Some future case in which the availability of the belt will be known to the plaintiff and in which there will be evidence indicating the failure to use it was a substantial factor in producing or aggravating the plaintiff's injuries may require us to consider holding that the issue, with proper instructions, ought to be submitted to a jury.* This case does not require it and we do not so hold.

*Cierpisz*, 247 Md. at 227 (emphasis added).

Defendants argue that this is that "future case" referred to by the Court of Appeals. (ECF No. 61 at 4). The Court disagrees. First, Plaintiff testified that he was not aware of the availability of a seat belt in the golf cart. (ECF No. 57-1 at 11). Second, there is no evidence that the seat belt

instruction now found on Defendants' golf cart was present at the time of the accident based on Defendant's representative's inability to confirm it.  (ECF No. 57-1 at 2 n.3) (citing ECF No. 57-1 at 22–23).

Further, there is photographic evidence of at least one golf cart that did not have the seat belt instruction at a time prior to the accident.  (ECF No. 75 at 22–27).  Moreover, it is far from a universal experience that golf carts include seat belts, such that it cannot amount to "common knowledge."  Under either a subject or objective standard, it cannot be said in this case that the availability of a seat belt was known—or should have been known—by Plaintiff at the time of the accident.

Maryland, clearly, had a public policy disfavoring such evidence even before the seat belt statute was passed as expressed in *Cierpisz*.  In fact, one could argue that including such an evidentiary prohibition in the very statutory scheme that mandates seat belt usage underscores that policy.  According to Plaintiff, in this situation, there is "particularly no societal consensus that all reasonable [people] will use a seat belt when driving in a golf cart."  (ECF No. 65 at 2).  Plaintiff also argues that any evidence related to seat belt warning signs is not admissible because there is no credible evidence that such signs existed.  *Id.*  In the context of golf carts in which seat belts are not standard and, at least as to this model, not required equipment, the situation is more akin to that facing courts before seat belts in automobiles were universally accepted as common and effective safety equipment.  As noted in *Cierpisz*, one's failure to use a seat belt is not evidence sufficient to support a finding of contributory negligence because "[t]he social utility of wearing a seat belt must be established in the mind of the public before failing to use a seat belt can be held to be negligence.  Otherwise the court would be imposing a standard of conduct rather than

applying a standard accepted by society." 247 Md. at 226 (quoting Roethe, *Seat Belt Negligence in Automobile Accidents*, 97 Wis. L. Rev. 1, 288 (1967)) (internal quotation marks omitted).

This lack of consensus, combined with Defendants' own lack of awareness as to the presence of seat belts in the golf cart, and no reliable evidence that instructions were present, does not provide the jury with a reasonable basis to apply the principles of contributory negligence or its sister doctrine—assumption of risk, as a plaintiff cannot be said to have a assumed a risk of which he was neither aware nor should have been aware based on common experience. Even if a sign was present, as Plaintiff effectively argues, the presence of a seat belt sign does not make Plaintiff's non-use of a seat belt admissible because a "reasonable person could reject signs requiring the use [of] seat belts on golf carts because the signs required safety measures beyond that required under an accepted standard of conduct." (ECF No 65 at 3).

Finally, with regard to an argument that the damages would have been avoidable or lessened by seat belt use, the Court notes the Maryland Court of Appeals decision in *Rogers v. Frush*, which disallowed such arguments in the context of a failure to wear a helmet, finding that the avoidable consequences doctrine could not be applied to a plaintiff's conduct that predated the alleged negligence of a defendant. 257 Md. 233, 240–41 (1970).

Accordingly, the Court will GRANT Plaintiff's Motion in Limine to Preclude Any Evidence Related to Plaintiff's non-use of a seat belt. (ECF No. 57).

## DEFENDANTS' MOTION TO STRIKE OR PRECLUDE TESTIMONY OF STEPHEN EISENBERG

Defendants move to strike Stephen Eisenberg, Plaintiff's expert in the area of personal transport vehicles/golf cart safety and fleet management.  (ECF No. 59 at 1).  Mr. Eisenberg is the owner of Golf Concepts, Incorporated, a full-service golf facility consulting service.  (ECF No. 64 at 78).  He is also a PGA Golf professional.  From 1992 to the present, Mr. Eisenberg has trained over 3,000 PGA golf professionals regarding such subjects as Golf Car Safety Practices, Golf Car Fleet Management, Facility Operations Management, and has been a subject matter expert for the PGA since 1995.  *Id*.  Mr. Eisenberg has been published nationally on risk management and golf cart operations and has consulted around the world on matters relating to personal transport vehicle/golf car fleet management and operations, speaking in China, Jamaica, and Korea, as well as on behalf of the PGA of America at their National Conferences.  *Id*.

Defendants argue that Eisenberg's testimony should be precluded because he: (1) applies a heightened standard of care; (2) assumes facts that would serve only to mislead the jury; and (3) improperly relies on testimony from unrelated litigation, rather than testimony in the current case about current practices.  (ECF No. 59 at 3–6).[2]

### Plaintiff's Opposition

Plaintiff responds: (1) Mr. Eisenberg can properly rely upon voluntary industry ANSI standards to form his opinion on the applicable standard of care; (2) a sufficient evidentiary basis exists under Rule 702 to support Plaintiff's contention that the Defendants' golf cart operator drove at full acceleration and made a sharp turn without slowing or providing a warning to Plaintiff; and

---

[2] As will be discussed in detail in subsequent sections, the parties dispute the appropriateness of considering information obtained during litigation in another case, wherein Jessica Bobrow filed suit against Fager's in the Circuit Court for Worcester County Maryland.  (ECF No. 63 at 4) (citing *Bobrow v. Fager's Island Ltd*., Case No. 23-C000395) ("*Bobrow*" case).

(3) there is a sufficient evidentiary basis, including Defendants' party admission from the previous *Bobrow* litigation, to support Mr. Eisenberg's negligent training opinion.  (ECF No. 64 at 1).

Legal Rule

Under Federal Rule of Evidence 104(a), the Court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence," including the admissibility of expert testimony under Federal Rule of Evidence 702.  In their briefings, both parties reference to Rule 702. (ECF Nos. 59 at 1 & ECF No. 64 at 64 at 1).  This rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 permits a properly qualified expert witness to testify regarding technical, scientific, or other specialized knowledge in a given field if it would assist the trier of fact in understanding the evidence or to determine a fact in issue. *Young v. Swiney*, 23 F. Supp. 3d 596, 609–12 (D. Md. 2014).  An expert must also opine based on reliable principles and methods, applied reliably to the facts. *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir. 1995). "The party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011).

As to reliability, *Daubert* articulated five factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory "can be and (has been) tested"; (2) whether the theory "has been subjected to peer

review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standard controlling the technique's operations"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993), *United States v. Crisp,* 324 F.3d 261, 265–66 (4th Cir. 2003). As a whole, the factors are meant to ensure "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). These factors are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Id.* at 151. "Regardless, the court 'should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate.'" *Young*, 23 F. Supp. 3d. at 611 (quoting *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004)).

<u>Analysis</u>

Mr. Eisenberg relied (partly) on the American National Standards Institute ("ANSI") standards to support his opinion on the applicable standard of care and the Defendants' breach thereof. (ECF No. 64 at 6). The Court of Appeals for the Fourth Circuit has stated that a "[v]iolation of an applicable ANSI standard is evidence of negligence in Maryland." *Smith v. Washington Metro. Area Transit Auth.*, 290 F.3d 201, 211 (4th Cir. 2002) (citing *Kent Village Assocs. Joint Venture v. Smith*, 104 Md. App. 507, 522 (1995)).

Defendants do not seem to argue that the cited ANSI standards do not apply.[3] Rather, they argue that reliance on such standards represents an "enhanced" standard of care and should be disallowed. (ECF No. 59 at 3). The Court disagrees. Maryland law is clear that "[b]ecause

---

[3] Defendants are not precluded from making such an argument at trial, although such an argument would go to weight and not admissibility based on the record before the Court at this stage.

advisory standards that are adopted by nongovernmental entities such as ANSI may represent a consensus regarding what a reasonable person in a particular industry would do, they may be helpful to the trier of fact in deciding whether the defendant has met the standard of care due." *Kent Village*, 104 Md. App. at 521–22 (quoting *Hansen v. Abrasive Eng'g and Mfg.*, 856 P.2d 625, 628 (1993)). While it is true that adherence or lack of adherence to ANSI standards may not, by itself, define the standard of care, it can be considered by the jury as evidence of it.

Defendants also argue that Eisenberg assumes facts that would serve only to mislead the jury, and that he improperly relies on testimony from an unrelated litigation. (ECF No. 59 at 4–7). First, Defendants note that Eisenberg's opinion is based upon the fact that the driver drove with "full acceleration" westbound on 60th Street until making a sharp left turn and this is the basis for his opinion that the unidentified Fager's operator was negligent. *Id.* at 4. Edward Heuser, a passenger on the golf cart at the time of alleged incident, however, testified that there was nothing that the driver was doing that was unsafe or unusual. At the same time, Plaintiff himself provides testimony that he sensed the vehicle was driving at a high rate of speed and then made a sudden turn. (ECF No. 64 at 8). By choosing one side of this factual dispute and ignoring the other, Mr. Eisenberg certainly invites cross examination as to the weight that should be given to his opinions, but this is not a basis for precluding his testimony.

Finally, Mr. Eisenberg indicates that he relied upon information from the prior litigation with respect to his opinion of the Defendants' lack of a proper training process, and noted that "[i]f the owner of a facility says we don't do any training and then subsequent there's an indication of an informal training process which seems willfully inadequate, I think both of those things are relevant." (ECF No. 59 at 5). At the time of his deposition, Mr. Eisenberg had not read the owner's deposition regarding the training program in place, but merely relied on that from the previous

litigation.  *Id.*  Defendants direct the Court to the testimony of Mr. Meyers indicating that Fager's Island provided hands-on-field training to its golf cart operators and did so prior to the instant accident.  *Id.*  As discussed below, reference to the prior incidents will not be admitted.  There is insufficient evidence of key details surrounding that incident including, for present purposes, if the training utilized at the time of the current incident was the same or different.  Accordingly, Mr. Eisenberg will not be allowed to rely on the prior incident in any testimony or exhibits offered.  However, he will be allowed to give his opinion that the training done prior to the time of the incident in question was not adequate based on the other factors he relies upon.  Thus, at this time, the Court will largely DENY Defendants Motion to Preclude the Testimony of Stephen Eisenberg except that the motion will be GRANTED in PART with regard to reliance on the earlier incident referenced.  (ECF No. 59).

## DEFENDANTS' MOTION TO PRECLUDE EVIDENCE OF PRIOR INCIDENTS OR LAWSUITS

Defendants move to prelude the introduction of any evidence at trial regarding any prior incidents or lawsuits involving the use of a golf cart at Fager's Island. (ECF No. 60 at 1). Defendants "believe that Plaintiff intends to introduce evidence regarding a prior unrelated golf cart lawsuit in an effort to confuse the issues and the jury in order to imply the negligence of Defendant." *Id.*

According to Plaintiff, in June of 2013, two female patrons of Fager's shuttle service were ejected from a golf cart "at the same turn under similar circumstances." (ECF No. 63 at 4). Specifically, a Fager's employee picked up two women, Jessica Bobrow and Heather McAllister, near Coastal Highway to drive them to Fager's bar at the end of 60th street. *Id.* Plaintiff argues "[a]s the driver made a sharp left turn, at an excessive speed for the conditions, the women were ejected to the right of the cart onto the pavement, suffering significant injuries, including a jaw fracture and head injuries." *Id.* In 2014, Jessica Bobrow filed suit against Fager's Island in the Circuit Court for Worcester County Maryland. *Id.*

### Plaintiff's Opposition

Plaintiff opposes the Defendants' motion on the basis that evidence of "the almost identical golf cart accident in the *Bobrow* litigation is admissible under the 'relaxed similarity [*sic*] test' to establish that the defendants were on notice of a potential hazard." (ECF No. 63 at 1). Plaintiff argues the prior *Bobrow* incident was "sufficiently similar to make the defendant aware of the dangerous condition." *Id.* Plaintiff argues that evidence of the prior accident is admissible for the question of notice of the underlying facts of the claim before Plaintiff's accident. *Id.* at 6. "Moreover, the prior litigation may also be indirectly brought out through impeachment utilizing Bobrow discovery responses." *Id.*

Defendants' Reply

Defendants maintain that in negligence cases it is improper to allow evidence of prior incidents to prove the negligence alleged in the immediate case. (ECF No. 66 at 1). They contend that not only is the evidence of prior accidents or incidents "completely irrelevant to any issue in this case," but also that its introduction to the jury will result in substantial prejudice to the Defendants, and the probative value of any such evidence is substantially outweighed by the danger of unfair prejudice. *Id.* at 2. In particular, Defendants contend "[e]vidence of other people falling from the golf cart after consuming alcohol has no other purpose except to solicit an emotional reaction by the jurors and to confuse the legal issues and standards in this case." *Id.*

Legal Rule

Rule 401 provides that evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence." *Cisson v. C.R. Bard, Inc.*, 86 F. Supp. 3d 510, 515 (S.D.W.Va. 2015), *aff'd* 810 F.3d 913 (4th Cir. 2016) (quoting Fed. R. Evid. 401). Relevant evidence, "as a general proposition," is admissible. *United States v. Queen,* 132 F.3d 991, 994 (4th Cir. 1997); *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise . . . ."). Federal Rule of Evidence 403 outlines several reasons which permit a court to exclude otherwise relevant evidence. This Rule provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Cisson*, 86 F. Supp. 3d at 517.

Defendants note that the Maryland Court of Appeals has said that in "negligence cases, we consistently have held that evidence of prior acts of alleged negligence are substantially prejudicial in nature, and is only admissible for limited purposes . . . .   In no instance, however, is such evidence admissible to prove the negligence alleged in the immediate case." *Lai v. Sagle*, 373 Md. 306, 319–20 (2003) (internal citations omitted).   Although not addressed by either party, while the Federal Rules govern the admissibility of evidence, Maryland law prescribes the elements and measure of damages to be awarded, and thus defines what is relevant. *Ramrattan*, 656 F. Supp. at 524.

<u>Analysis</u>

Reference to prior litigation will be unfairly prejudicial and will confuse the jury.   Further, evidence of this prior accident has little probative value given the distinguishing characteristics between the two.   Plaintiff notes that the accidents happened about a year apart and involved the same turn, the same type of golf cart, and "similar circumstances."   (ECF No. 63 at 5).   In the Court's view, however, this is too far of a stretch.   For example, there is no indication that the driver of the golf cart was the same, nor that the circumstances surrounding the accident were the same (*i.e.,* the weather, the physical characteristics of the Plaintiff, the time of day).   For instance, hypothetically, it would be inappropriate to correlate one individual getting into a car accident on 60th street, and then another (wholly separate individual) getting into a car accident on 60th street a year later. *See Smith v. Hercules Co.*, 204 Md. 379, 385 (1954) (determining evidence of other accidents, particularly where the circumstances are not identical, have little probative value and are calculated to prejudice the jury), *Salisbury Coca–Cola Bottling Co. v. Lowe,* 176 Md. 230, 241 (1939) (holding when separate occurrences are independent and there is no necessary evidentiary

connection between them, the admission of evidence of prior occurrence "instead of aiding the jury in the solution of the subject of inquiry, tended to excite its prejudice, and mislead it."), *Cumberland v. Turney*, 177 Md. 297, 318 (1930) (stating the prevailing rule of law: evidence of prior similar occurrences is only admissible for certain limited purposes, but not for the purpose of showing negligence on the part of the accused nor to prove the cause of a specific occurrence). This is particularly so in a situation where the accidents appear to have occurred due to alleged failures by the golf cart operators rather than other factors relating to the path travelled.

Plaintiff's allegations and opinions as to this prior case will waste time and result in a mini trial concerning the circumstances of that case. The case was settled, and there was no proof or admission of guilt. Balancing these factors, information about prior incidents or lawsuits is inadmissible under Rule 403.[4] This preclusion applies to admissibility for any purpose. Defendants' Motion to Preclude Evidence of Prior Incidents or Lawsuits (ECF No. 60) is GRANTED.

---

[4] See *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008) ("District judges enjoy wide discretion to determine what evidence is admissible under [Rule 403]."), *Holley v. N. Carolina Dep't Admin.*, 846 F. Supp. 2d 416, 434 (E.D.N.C. 2012).

PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY OF TARA T. AMENSON

Plaintiff moves to preclude the testimony of Defendants' expert, Tara T. Amenson, Ph.D. (ECF No. 70 at 1).  Doctor Amenson is a biomechanical engineer.  (ECF No. 86-1 at 1). Dr. Amenson is also an Associate Safety Professional ("ASP") and Certified Safety Professional ("CSP"), which provides her with "experience in assessing worksite injury risks, potential hazards, regulatory compliance, and ergonomics."  (ECF No. 70-2 at 1).  Further, Dr. Amenson "works as a technical consultant with emphasis on biomechanics and analysis of sports and recreational injuries, playground accidents, worksite safety incidents, and automatic accidents." *Id.*  In her job, Dr. Amenson is responsible for "evaluating workplace safety signage and safety labels and warnings."  *Id.* at 2.  Dr. Amenson has consulted on safety standards in crash events and has experience with examining safety devices and systems in a variety of vehicles.  (ECF No. 86 at 1).

Plaintiff contends that Dr. Amenson does not have the requisite knowledge, skill, experience, training, or education to render a standard of care opinion with respect to the safe driving of a golf cart or the management of a golf cart transportation fleet, in accordance with Federal Rule of Evidence 702.  (ECF No. 70-1 at 2).   Plaintiff acknowledges that Dr. Amenson is "very accomplished," and "qualified to render expert opinions in a good many areas," including as to the "mechanical forces involved on the human body during the turn and upon plaintiff's impact on the pavement."  *Id.* at 2–3 (quoting *Phelan v. Synthes*, 35 Fed. App'x 102, 106 (4th Cir. 2002)).   However, Plaintiff maintains that Dr. Amenson's experience does not bear on the issues in this case, except in a general way, rendering her unqualified to testify as to the standard of care applicable to the driving of a golf cart or the training/supervising of operators.  *Id.*

Defendants' Opposition

Defendants respond that while Dr. Amenson, admittedly, is a biochemical engineer, she is also a Certified Safety Professional and an Associate Safety Professional, which qualifies her to

speak to safety, standards, risks, and hazard identification, prevention and the implementation of control measures. (ECF No. 86 at 1). Defendants reason that through this experience, Dr. Amenson is knowledgeable and experienced with the applicable industry and ANSI standards for the training and operation of golf carts. *Id.*

Legal Rule

Regarding an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See Kumho Tire,* 526 U.S. at 156 (stating "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See, e.g.*, *Smith v. Central Admixture Pharm. Servs., Inc.,* 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.,* 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999))). Although the fit between an expert's specialized knowledge and experience and the issues before the Court need not be exact, an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392–93 (D. Md. 2001).[5]

---

[5] S*ee Wheeler v. John Deere*, 935 F.2d at 1090, 1101 (4th Cir. 1991) (holding lack of perfect fit will go to the weight not the admissibility of expert testimony in context of products liability case), *Wilhelm v. Ameristep Corp.*, 2018 WL

Analysis

As acknowledged, Dr. Amenson appears to be qualified to testify as an expert in this context, given her experience, education, and background.  Specifically, as a Certified Safety Professional, she has "experience in assessing worksite injury risks, potential hazards, regulatory compliance, and ergonomics."  (ECF No. 70-2 at 1).  In addition, she has experience with evaluating workplace safety and product safety labels.  Notably, however, Dr. Amenson was not deposed, nor is a report of her findings included here.  As it is uncertain as to what Dr. Amenson will say, and what she intends to testify regarding, the Court will deny this motion without prejudice.  Before Dr. Amenson (like any trial expert) is permitted to render expert opinions, Defendants will offer her background, training and credentials, Plaintiff will cross examine as to those areas, and then Defendants will offer Dr. Amenson as an expert in certain areas.  The Court will render a decision at that time as to the areas in which Dr. Amenson may testify.  Accordingly, the Court will DENY Plaintiff's Motion to Preclude the Testimony of Tara T. Amenson, Ph.D. without prejudice.  (ECF No. 70).

---

6272911, at *9 (W.D. Va. Nov. 30, 2018) (declining to exclude mechanical engineer's testimony regarding a tree stand regardless of his lack of experience with tree stands generally).

PLAINTIFF'S MOTION TO PRECLUDE THE TESTIMONY OF JOHN S. KAHANI, D.O.

Plaintiff moves to preclude the testimony of Defendants' expert, John S. Kahani, D.O. (ECF No. 74).  Doctor Kashani is an actively practicing physician with board certifications in Emergency Medicine, Medical Toxicology and Addiction Medicine.  (ECF No. 74-7 at 1).  Dr. Kashani is "a core faculty" member and is actively involved in teaching emergency resident physicians as well providing didactics for other residencies.  Dr. Kashani's work provides him with the "opportunity to evaluate, treat, and disposition patients that are suffering from medical illnesses, traumatic injuries, adverse effects of drugs and toxins, both from medicinal agents, alcohol and drugs of abuse."  *Id.*

Plaintiff argues that Dr. Kashani's testimony must be struck because it is not based on a reliable methodology (or any at all), or otherwise sufficient facts and data.  *Id.* at 4.  Specifically, Plaintiff argues that in forming his opinion Dr. Kashani, inappropriately, relied on facts that only support his speculative assumptions.  According to Plaintiff, in rendering his opinion, Dr. Kashani based his opinions on the fact that: (1) Plaintiff prioritized reporting the accident over seeking medical attention; (2) Plaintiff was previously charged with a DWI; and (3) Plaintiff would have been more injured based on the distance he claimed he rolled; and (4) Plaintiff must have consumed more alcohol later in the day based on receipts from his cohorts.   (ECF No. 74-1 at 3).

Defendants' Opposition

In response, Defendants acknowledge Dr. Kashani's conclusion that it would be "difficult to reliably estimate [Plaintiff's] alcohol level at or around the time of the alleged incident" given that Plaintiff did not submit to blood alcohol testing at the time.  (ECF No. 85 at 3).  Defendants argue that Dr. Kashani's reports, appropriately, do not attempt to discern or calculate a specific BAC given the generally recognized difficulties in conducting such an analysis.  *Id.*  Defendants

further argue that merely because Dr. Kashani does not render a "numerical opinion as to Plaintiff's [BAC] does not then invalidate his opinion as a toxicology expert in this matter." *Id.* at 3.[6]

## Legal Rule

The question before the Court is whether Dr. Kashani's opinions are "based on sufficient facts or data" and are "the product of reliable principles and methods . . . [that were] reliably applied . . . to the facts of the case." *Coal. for Equity & Excellence v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 552 (D. Md. 2017) (citing Fed. R. Evid. 702).   For the reasons discussed below, the Court finds that Dr. Kashani's opinions do in part, and do not in part, satisfy this standard.

## Analysis

Dr. Kashani is listed as an expert toxicologist who will opine that Plaintiff was impaired at the time of the accident, which was a causative factor that attributed to the occurrence.  (ECF No. 74-1 at 3).  In drawing this conclusion, Dr. Kashani acknowledges Plaintiff's perspective, and that of Plaintiff's expert, that Plaintiff was not intoxicated at the time of the incident.  Dr. Kashani, however, wrote that Plaintiff underestimated the amount of alcohol he consumed.  *Id.* at 7.  Dr. Kashani came to this conclusion because: Plaintiff described a significant and painful injury of his dominant arm, but he felt it more important to report the incident than to seek medical attention. In Dr. Kashani's experience, people who have acute fractures do not normally delay seeking treatment unless they are inebriated, incapacitated or otherwise have a high pain threshold.  *Id.* Further, Dr. Kashani says that it is a "reasonable inference" that Plaintiff, having had a previous DWI, is at a risk for recidivism, and that he drank to the point of being intoxicated on the night of

---

[6] The Defendants cite to *Bocanegra v. Vicmar Servs.*, 308 F.3d 581 (5th Cir. 2003) in support of their argument that Dr. Kashani has relied on generally accepted principles, as well as documents and facts presented during discovery, to opine as to the impairment that results from imbibing of alcohol.  (ECF No. 85 at 4-5).

the injury.   In support thereof, Dr. Kashani relies on his own experience, in addition to "peer reviewed works."  (ECF No. 74-7 at 9).  Dr. Kashani also emphasizes the multiple discrepancies in the testimony provided by Plaintiff, Ed Heuser and Michael Inemer (Plaintiff's friends), and conflicting reports in the physician's medical records as to the events surrounding the accident. (ECF No. 74-7 at 5).

Although, a "numerical opinion" as to Plaintiff's blood alcohol at the time of the accident is not required, an expert must opine based on reliable principles and methods, applied reliably to the facts.  *Benedi*, 66 F.3d at 1384 (recognizing "epidemiological studies are not necessarily required to prove causation," but a proposed expert must show "the methodology employed . . . in reaching his or her conclusion is sound").  Dr. Kashani is qualified and has a sufficient basis to opine as to factors that could render a BAC inaccurate, and how alcohol impairment can be generally assessed by one's behavior and pain threshold in relation to certain injuries with which Dr. Kashani (as a trained ER physician) is familiar.  Dr. Kashani may rely on the conflicts between witness testimony to support his opinion that Plaintiff drank more than represented and/or more than the amount offered by Plaintiff's experts.  Of course, all of this is subject to vigorous cross examination which might well undermine the weight of the opinion.  Clearly, there are certain variables that cannot be known for certain (given that Plaintiff nor any of the witnesses have such a recollection), such as the exact amount of alcohol consumed by Plaintiff on the date of the accident.  Nonetheless, the Court remains unpersuaded that these variables alone render Dr. Kashani's opinions concerning Plaintiff's inebriation at the time of injury, and his opinion in general that alcohol was either a causative or aggravating factor resulting in his injury, wholly unhelpful nor unreliable under *Daubert*.  (ECF No. 74-7 at 8).   The value of this opinion is a question for the jury.  *See e.g.*, *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir. 2006)

(recognizing "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

That said, Dr. Kashani's opinion that because Plaintiff had a previous DWI conviction Plaintiff drank to the point of being intoxicated on the night of the injury, is far too speculative to be allowed. (ECF No. 74-7 at 7).  This is simply too far of an analytical leap, and this Court's gatekeeping function requires more than simply accepting Dr. Kashani's subjective and controversial inquiry.   In addition, to the extent Defendants seek to bring up Plaintiff's DWI conviction, it is deemed inadmissible.  *See, e.g.*, *Lai*, 373 Md. at 320.

Dr. Kashani is also precluded from testifying as to his opinion that Mr. Inemer, the rear-facing passenger was at a particular risk to fall from the golf cart.  Dr. Kashani is not an engineer and has not performed any studies or tests to provide a basis for him to opine on the most at-risk passenger in the golf cart was.

Accordingly, Plaintiff's Motion to Preclude the Testimony of Dr. Kashani (ECF No. 74) is DENIED in PART and GRANTED in PART.

DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF DR. HUFFMAN

Defendants move to preclude the testimony of Plaintiff's expert, Dr. Huffman. (ECF No. 82). Doctor Huffman is a board-certified orthopedic surgeon, and Plaintiff's treating physician. (ECF No. 89-1 at 1). Additionally, Dr. Huffman is an academic shoulder and elbow surgeon at the University of Pennsylvania and the Director of the University's nationally accredited Shoulder and Elbow Fellowship program. *Id.* Dr. Huffman's extensive resume details his experience as an orthopedic surgeon, including his significant involvement in peer reviewed research publications. See (ECF No. 89-1 at 15).

Dr. Huffman opined that as a direct and proximate cause of the accident, Plaintiff became a "candidate for open reduction internal fixation surgery (with compression screw fixation) of the radial head, lateral ulnar collateral ligament repair, and a synovectomy involving resection of damaged tissues from the radiocapitellar joint." *Id.* at 2. Dr. Huffman performed that surgery on August 27, 2014. *Id.* Post-surgically, Dr. Huffman opined that Plaintiff's elbow remains a joint that is "vulnerable to degenerative changes and damage." *Id.* Further, Dr. Huffman opined that the chance of Plaintiff "developing these conditions will increase over time. As a direct result of the injuries he sustained, the odds of [Plaintiff] developing articular cartilage wear and post-traumatic arthritis are much higher than had he not been injured and make it likely that he will require future surgery. [Plaintiff] will likely require[] arthroscopic surgery on his elbow in the next 10-15 years." *Id.* Dr. Huffman reported that the cost associated with this surgery are approximately $45,000. Similarly, Dr. Huffman opined that "within approximately 25-30 years, [Plaintiff] has a higher likelihood of requiring a partial replacement of the elbow involving the radial head and the opposing articular surface, the capitellum." *Id.* at 2. Dr. Huffman approximated the cost for this surgery will be $70,000. *Id.* Dr. Huffman, additionally, opined that

Plaintiff will likely require a course of three injections every ten years and physical therapy (20 visits) following surgeries. *Id.* at 2–3.

Defendants argue that Dr. Huffman's opinion as to Plaintiff's future impairment is speculative. (ECF No. 82 at 3). Defendants note that Dr. Huffman testified at his deposition that there are not enough studies on elbow surgeries to say that there will be degenerative change will actually materialize, and the best that he can say is that there are increased odds or an increased risk of Plaintiff developing it. *Id.* Further, with respect to future surgery being necessary, Dr. Huffman conceded that his opinion is not based on literature, rather on his clinical experience. Defendants argue this alone is not reliable because they do not have "data as to who is patients are and whether they are an objective sampling of persons." *Id.*

## Plaintiff's Opposition

Plaintiff responds that Dr. Huffman held, to a reasonable degree of medical certainty, that Plaintiff has a 75% chance of developing degenerative changes requiring surgery based on: (1) the facts and data he developed in his treatment of Plaintiff; (2) the fact that Plaintiff has already developed degenerative changes as established by the objective MRI findings; and (3) Dr. Huffman's significant experience treating traumatic elbow injuries at a major teaching hospital. (ECF No. 89 at 1).

## Legal Rule

The Court outlined the applicable Rules of Evidence above. In addition, in Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. *Derosier v. USPLabs, LLC*, No. CIV. CCB-10-2559, 2011 WL 5825990, at *4 (D. Md. Nov. 17, 2011). To the contrary, damages "based on future consequences of an injury . . . cannot be recovered if future consequences are 'mere

possibilities.'"   *Id.* (quoting *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 666 (1983)). Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything less. *Davidson v. Miller,* 276 Md. 54, 62 (1975), *Hapengos v. Shilley*, 846 F.2d 71 (4th Cir. 1988).

<u>Analysis</u>

There appears to be no disagreement that Dr. Huffman is a qualified expert and will testify about a subject beyond the knowledge of lay persons.  See FRE 702.  However, the Defendants contest the reliability of his opinion, and his ability to apply his knowledge to the circumstances of the case.  In coming to his conclusions, Dr. Huffman reviewed Plaintiff's medical records and diagnostic studies, including x-rays (elbow and forearm) and a CT scan (elbow), Plaintiff's medical history as he provided it, Dr. Huffman's own examinations and treatment of Plaintiff, and his experience in his "field of expertise."  (ECF No. 89-1 at 1–2).  As the Advisory Committee's notes to Rule 702 provide, an expert's experience alone, or in conjunction with "other knowledge, skill, training or education," can provide a sufficient foundation for expert testimony.  Further, as required, Dr. Huffman explained how his experience lead to his conclusion, and why his experience provides a sufficient basis for this opinion (given the lack of literature, generally), and how he reliably applied his experience to the facts.  *See Kumho*, 526 U.S. at 156, Fed. R. Evid. 702.  Given Dr. Huffman's extensive experience and review of pertinent literature, the Court is convinced that his opinion is based on reliable methods applied to the facts of this case.

Further, Dr. Huffman's opinions are permissible to base future costs of off, despite his 75% assurance.  This testimony indicates more than a possibility that Plaintiff will require future surgery, rather a 75% probability.  Certainly, the level of precision is an acceptable topic for cross-

examination, but there is no indication that Dr. Huffman made an unreliable approximation. *See*, e.g., *Moore v. BPS Direct, LLC*, 2019 WL 2913306, at *2 (D.S.C. July 8, 2019).  In addition, the parties are free (of course) to suggest a jury instruction pertaining to future damages, and the appropriate standard of proof for such.  *See, e.g.*, *Hutzell v. Boyer*, 252 Md. 227, 238 (1969).

The Court will DENY Defendants' Motion to Preclude the Testimony of Dr. Huffman (ECF No. 82).

DEFENDANTS' MOTION TO PRECLUDE TESTIMONY OF DR. YALE CAPLAN

Defendants move to preclude the testimony of Plaintiff's expert, Dr. Caplan. (ECF No. 83). Doctor Caplan is a board-certified forensic toxicologist. (ECF No. 93-1 at 1). Dr. Caplan was employed as the toxicologist for the State of Maryland Office of the Chief Medical Examiner, and as such was the Director of the State of Maryland DWI Alcohol Testing Program, exercising regulatory authority over a statewide system, and was responsible for the training of police blood chemists and breath test operators in the pharmacology and effects of alcohol. Dr. Caplan has testified in many states and Federal Courts, more than 400 times, with regard to alcohol testing, intoxication and impairment. In so doing, Dr. Caplan has offered testimony about the effects resulting from the ingestion of alcohol and the absorption, distribution and elimination of alcohol in the human body, and more specifically, the likelihood of the appearance of effects at given times following the consumption of alcohol. *Id.*

Defendants argue that Dr. Caplan's conclusion gave undue weight to Plaintiff's version of the events because he ignored the totality of the evidence and relied exclusively on Plaintiff's version. (ECF No. 83 at 3). During Dr. Caplan's testimony, Counsel said, "[n]ow we have receipts of drinks purchased by Mr. Cleary from Seacrets earlier that afternoon that suggest a different timeline and drinks other than the Budweisers that he testified to. Would that information have been relevant to you in evaluating this case?" (ECF No. 93-3 at 2). In response, Dr. Caplan said, "[n]o, there would have to be facts. In other words, any set of facts that you might want to propose or that someone else wants to propose could be calculated, but they're all still—there's no facts. The information here is more hearsay and limited, meaning I don't know. There's no factual witness as to what he actually drank, and so without that, I can't, -- it wouldn't make any difference to me . . . ." *Id.* Counsel followed-up with Dr. Caplan and asked if "having that [additional]

information and drawing assumptions from that information would affect the opinions that you reach[ed]?"  *Id*.  Dr. Caplan responded, "[i]t may or may not.  I mean it may if they were substantially different.  Now my recollection is—and I did see those receipts—that I know only the first and second are related to Mr. Cleary, and the other two were from other people, and if Mr. Clearly drank a different drink that's equivalent to one drink, it wouldn't have made any difference as to what the drink was, and there's no reason to—no way we can tell with a large cadre of drinks as to which ones he drank."  *Id*.

Plaintiff's Opposition

Plaintiff argues that he has a "good recollection of the operative facts which a jury could credit and that properly form a reliable basis for Dr. Caplan's opinion.  Furthermore, the subject credit card receipts support Plaintiff's version of alcohol consumption and do not render Dr. Caplan's opinions as unreliable."  (ECF No. 88 at 1).

Analysis

Based on his education, training, and experience in this field, in addition to his review of the facts and circumstance of this occurrence, Dr. Caplan determined that Plaintiff's blood alcohol concentration at approximately 7:00 p.m., around the time of the accident, was approximately zero. (ECF No. 93-1 at 3).  In forming this opinion, Dr. Caplan relied largely on Plaintiff's subjective recollection of the incident, including Plaintiff's medical records, Plaintiff's Complaint, and Plaintiff's deposition testimony.  *Id*. at 2.  During his deposition Dr. Caplan acknowledged the limited amount of information in this case, and that he relied upon Plaintiff's version of the events. (ECF No. 93-3 at 2).  By choosing one side of this factual dispute and ignoring the other, Dr. Caplan certainly invites cross examination as to the weight that should be given to his opinions,

but this is not a basis for precluding his testimony.  Overall, the unknown variables present do not necessarily make Dr. Caplan's opinion unreliable.

Moreover, Dr. Caplan did not rely solely on Plaintiff's subjective statements, but also upon his "regular review of authoritative literature and standards, and [his] knowledge and experience in [his] field of expertise." *Id.*  In his deposition, Dr. Caplan also mentions that he did, in fact, review the Seacret's receipts.  (ECF No. 93-3 at 2).  Dr. Caplan has significant experience in this arena.  This includes substantial writing and publication experience including authoring the chapter entitled "Determination of Alcohol in Blood and Breath" in Saferstein's Forensic Science Handbook; co-editing and co-authoring six chapters in Garriott's Medicolegal Aspects of Alcohol; and co-authoring the chapter on alcohol in Levine's Principles of Forensic Toxicology.  (ECF No. 93-1 at 1).

Dr. Caplan's "pharmacokinetic computations" are based on a tested scientific method and are the product of a reliable application of this method to the facts of this case. The jury will determine the weight to give Dr. Caplan's testimony, based on these unknowns, and the limited items that he considered in rendering his opinion.  However, this will go to weight, not admissibility.  Accordingly, the Court will DENY Defendant's Motion to Preclude the testimony of Dr. Caplan.  (ECF No. 83).

DEFENDANTS' MOTION FOR SPOLIATION SANCTIONS

Defendants move for sanctions against Plaintiff. (ECF No. 84). Defendants argue that Plaintiff's failure to preserve evidence as to: (1) how this incident occurred; (2) the identity of the golf cart driver, as well as other witnesses, and (3) his blood alcohol level at the time of the alleged incident, result in prejudice to the defense and warrant spoliation sanctions. *Id.* at 1.

### Plaintiff's Opposition

Plaintiff responds that there is no evidence that he willfully spoiled any evidence or that he even possessed or controlled evidence that he had a duty to preserve. (ECF No. 87 at 1).

### Legal Rule

Spoliation of evidence refers to "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 511 (S.D.W. Va. 2014) (quoting *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). The duty to preserve evidence arises "not only during litigation but extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Once the duty is triggered, the party should "identify, locate, and maintain information that is relevant to specific, predictable, and identifiable litigation." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522–23 (D. Md. 2010).

This Court and others have conditioned the imposition of spoliation sanctions on proof by the moving party of the following elements:

(1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a

'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009) (quoting *Thompson v. H.U.D.*, 219 F.R.D. 93, 101 (D. Md. 2003)).

None of these elements are present here. In the first instance, Defendants do not point to any particular evidence that was lost, only to an alleged failure to adequately report and investigate the incident. But Plaintiff did attempt to report the incident, according to his testimony. Moreover, if Defendants' theory of "spoliation" were to prevail, it could be argued that they were just as culpable in that they did not pursue an investigation, did not preserve information that would have disclosed the identity of the driver, and did not interview witnesses. The Court declines to equate such actions by either party with the loss or destruction of evidence under the circumstances required for a finding of spoliation as outlined above. Accordingly, Defendants' Motion for Sanctions (ECF No. 84) is DENIED.

## CONCLUSION

For the reasons described herein:

1. Plaintiff's Motion in Limine to Preclude any Evidence related to Plaintiff's Non-use of a Seat Belt (ECF No. 57) is **GRANTED**;

2. Defendants' Motion in Limine to Strike or Preclude Testimony of Stephen Eisenberg (ECF No. 59) is **DENIED in PART and GRANTED in PART**;

3. Defendants' Motion in Limine Preclude Evidence of Prior Incident or Lawsuits (ECF No. 60) is **GRANTED**;

4. Plaintiff's Motion to Preclude the testimony of Tara T. Amenson, Ph.D. (ECF No. 70) is **DENIED without PREJUDICE**;

5. Plaintiff's Motion in Limine to Preclude the Testimony of John S. Kashani, D.O. (ECF No. 74) is **DENIED in PART and GRANTED in PART;**

6. Defendants' Motion in Limine to Preclude the Testimony of Dr. Huffman (ECF No. 82) is **DENIED**;

7. Defendants' Motion in Limine to Preclude the Testimony of Dr. Caplan (ECF No. 83) is **DENIED**;

8. Defendants' Motion in Limine for Spoliation Sanctions (ECF No. 84) is **DENIED**.

An implementation Order shall issue.

Date: August 6, 2020                          _____/s/_____

                                                    J. Mark Coulson
                                                    United States Magistrate Judge